## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## CONSOLIDATED

| | |
|---|---|
| SSI CLAIMSNET, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant, )<br>and )<br><br>CHANGE HEALTHCARE )<br>OPERATIONS, LLC, )<br><br>Defendant-<br>Intervenor. ) | No. 23-581C<br><br>Filed: March 29, 2024<br><br>Re-issued: April 12, 2024\* |
| AVAILITY, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant, )<br>and )<br><br>CHANGE HEALTHCARE )<br>OPERATIONS, LLC, )<br><br>Defendant-<br>Intervenor. ) | No. 23-734C |

---

\* The Court issued this opinion under seal on March 29, 2024, and directed the parties to file any proposed redactions by April 5, 2024.  The opinion issued today incorporates the redactions jointly proposed by all four parties.  Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 11).  Redacted material is represented by bracketed ellipses "[. . .]."

## OPINION AND ORDER

In this consolidated post-award bid protest, Plaintiffs SSI Claimsnet, LLC ("SSI") and Availity, LLC ("Availity") contend that the U.S. Department of Veterans Affairs ("VA") improperly awarded a contract for Electronic Data Interchange ("EDI") and Paper-to-Electronic ("P2E") support services to Defendant-Intervenor Change Healthcare Operations, LLC ("Change"). Specifically, SSI alleges that the VA's evaluation of its technical proposal, as well as the VA's best value determination, were flawed. Availity alleges that the VA erred in its technical analysis and price analysis. As explained below, the Court **DENIES** SSI's and Availity's Motions to Supplement the Administrative Record, **DENIES** SSI's and Availity's Second Motions for Judgment on the Administrative Record, and **GRANTS** the Government's and Change's Cross-Motions for Judgment on the Administrative Record.

## I.   BACKGROUND

### A.   The Solicitation

On January 18, 2023, the VA issued Request for Proposals 36C10G23R0004 ("RFP" or "Solicitation") seeking a healthcare clearinghouse contractor to provide EDI and P2E transaction services to the VA's Veterans Health Administration, Office of Integrated Care ("IVC") (formerly the Office of Community Care). Admin. R. 194, 302, ECF No. 24.[1] The IVC utilizes healthcare clearinghouses "to provide connectivity with community providers to support payment for services provided to Veterans and Veteran Families via incoming and outgoing EDI services." AR 364. The IVC accepts both paper and electronic submissions for healthcare claims and supporting documentation. *Id.*

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.

The IVC has implemented various initiatives to increase the volume and overall percentage of electronic transactions versus paper or other manual transactions to comply with legislation and efficiently facilitate administration of claims. *Id.* The IVC uses healthcare clearinghouses to transmit incoming and outgoing EDI transactions to over one million medical and dental providers throughout the United States and its territories. *Id.* EDI transactions consist of batch and real-time transfers of Health Insurance Portability and Accountability Act ("HIPAA") ACS X12N 5010 transactions. *Id.* The IVC also supports several hosted real-time EDI transactions. *Id.*

As set forth in the requirements of the Performance Work Statement ("PWS"), the VA sought a healthcare clearinghouse contractor to support "a single national location" to receive paper-based submissions, convert the submissions to electronic formats, and transmit them though EDI to the IVC. AR 366. The contractor would also support the transmission and receipt of EDI transactions between the IVC and healthcare providers. *Id.* The Solicitation contemplated a single award Indefinite Delivery Indefinite Quantity Firm-Fixed Price contract in accordance with the acquisition procedures in Federal Acquisition Regulation ("FAR") Parts 12 and 15. AR 197. The period of performance consisted of one base year and nine option years. AR 197. The VA amended the RFP twice to provide answers to offeror questions, incorporate changes to the PWS, incorporate changes to or otherwise clarify evaluative factors, and to update instructions to offerors. *See* AR 353, 433.

**B.     Proposal Requirements and Evaluation Criteria**

The Solicitation explained that the VA would make an award on a best value tradeoff basis considering the following factors: (1) Technical; (2) Past Performance; (3) Socio-economic Status; and (4) Price. AR 262, 271. The Technical factor was significantly more important than the Past Performance factor, which was significantly more important than the Socio-economic Status

factor.  AR 262.  When combined, the Technical, Past Performance, and Socio-economic Status factors were significantly more important than the Price factor, which was identified as the least important factor.  *Id*

Of particular importance to this protest, the Solicitation advised that the offeror's Technical proposal should "demonstrate an understanding of the technical requirements to assure the Government that the Offeror can perform mission-critical support services exemplified by appropriate resources to execute the [PWS]."  AR 266.  The Technical factor was divided into three sub-factors: (1A) Technical Approach; (1B) Key Personnel Resumes; and (1C) Corporate Accreditation and Certification.  AR 262, 271.  All Technical sub-factors were identified as being of equal importance.  *Id.*  This consolidated protest implicates sub-factors 1A and 1C.

With regard to Technical sub-factor 1A, Technical Approach, proposals would be evaluated to determine: (a) "[t]he extent to which the Offeror's proposed technical approach is feasible, practicable, and that the end results are achievable to meet and/or exceed the requirements of Section 5 of the PWS;" (b) "[t]he level of risk with respect to the Offeror's methods and approach to meet and/or exceed the requirements of Section 5 of the PWS;" and (c) "[w]hether the Offeror's methods and approach have adequately and completely considered, defined, and satisfied the requirements of Section 5 of the PWS."  AR 272.  For Technical sub-factor 1C, Corporate Accreditation and Certification, the proposals would be evaluated to determine: (a) "[t]he Offeror's previous, current, and future demonstrated ability to obtain and maintain Accredited Healthcare Network accreditation by EHNAC [Electronic Healthcare Network Accreditation Commission] to meet the requirements in Section 6 of the PWS;" and (b) "proof of certification of the Offeror's compliance with the current Council for Affordable and Quality Healthcare (CAQH) Committee on Operating Rules for Information Exchange (CORE) rules," including "the ability to maintain

this accreditation and compliance with future mandates throughout the life of the contract as described in Section 6 of the PWS." *Id.*

The RFP explained that the Agency would utilize and assign narrative definitions and adjectival ratings in evaluating proposals. AR 178. The VA provided narrative definitions, which identified merits or flaws in the proposals, as follows:

> **Strength:** Exceeds a requirement. Results in significant benefit to the Government; potential for significant positive impact on quality of products or services.
>
> **Weakness:** A flaw in the proposal that increases the risk of unsuccessful contract performance.
>
> **Deficiency:** Is a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

AR 179. The VA's adjectival ratings, which it would apply to all factors but Price, included the following:

| Rating | Description |
|---|---|
| Excellent | Proposal meets requirements and indicates an exceptional approach and understanding of requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is not awardable |

*Id.* To be considered for award, an offeror's Technical proposal had to receive a rating of no less than "Acceptable." AR 177.

With regard to the Price factor, the RFP instructed offerors to submit proposed pricing for each Contract Line Item Number ("CLIN"), utilizing the spreadsheet appended to the Solicitation titled "Attachment B Pricing."  AR 269; *see also* AR 399–411.  The Solicitation stated that price would be evaluated to determine whether the proposed price was fair and reasonable.  AR 269, 273.  For purposes of the evaluation, pricing would be evaluated for the base year and all option years.  AR 270, 273.  The evaluation of options would not obligate the Agency to exercise the option(s).  Rather, the VA advised offerors that it would evaluate the option to extend services, pursuant to FAR 52.217-8, by adding to the total proposed price a sum of one-half of the offeror's final option period.  AR 273.  For award purposes, the Agency would evaluate offers by adding the total price for all options to the total price for the base requirement.  AR 270, 273.  As required by FAR 15.404-1(g), the RFP called for an unbalanced pricing evaluation and reserved the VA's discretion to "reject any offer that is materially unbalanced as to prices."  *Id*.

The Solicitation also cautioned offerors that the award may not necessarily be made to the offeror proposing the lowest price if the Agency determined that the merits of one or more of the non-price factors warranted a price premium.  AR 263.  It also warned that the VA would not establish a contract with an offeror whose price was found to be unreasonable.  *Id.*

### C.    The Evaluation and Award

The VA received timely proposals from four offerors, including SSI, Availity, and Change.  AR 882.  On March 27, 2023, a Technical Evaluation Panel ("Panel") issued its initial evaluation of the offerors' technical proposals.  AR 864–69.  The Panel rated SSI's and Availity's proposals as "Unacceptable."  AR 864–65, 868–69.  Change received a rating of "Excellent" for its technical proposal.  AR 865–66.

Regarding SSI, the Panel identified one strength and one weakness in SSI's technical proposal. AR 868–69. For the Technical Approach sub-factor (1A), the Panel awarded a strength to SSI for its "Services and Deliverables," but identified a weakness in SSI's CAQH CORE response times. AR 868. The Panel explained:

> SSI stated on page 6 of their proposal that their direct "…real time solution consistently generates response times 10-15x faster than the CAQH CORE response limitation standard of 20 seconds" and their "hosted real time solution generates response times 20-30x faster than the CAQH CORE response limitation standard of 20 seconds". VA does not find this feasible as that implies a transaction timeframe of approximately two seconds, which SSI cannot control the provider or VA system response times. VA considers this a weakness in SSI's understanding of this requirement.

*Id.* The Panel also noted that SSI did not propose a solution to the requirement in PWS Section 5.5 for transition out services, which the VA considered a deficiency. *Id.*

The Panel determined that Availity's proposal had two weaknesses and one deficiency. The Panel assessed a weakness based on Availity's failure to explain how it would meet the Payer Identifier requirement in PWS Section 5.2.10. AR 864. The Panel similarly assessed a weakness based on Availity's failure to explain how it would meet the hosting requirement. *Id.* Finally, like SSI, the Panel noted that Availity did not propose a solution to the requirements in PWS Section 5.5 for transition out services, which the VA considered a deficiency. *Id.*

Separately, the Panel awarded Change's proposal seven strengths, no weaknesses, and no deficiencies. AR 865–66. The Panel summarized its findings as follows: "Change Healthcare's proposal indicates an exceptional and comprehensive understanding, has numerous strengths, no weaknesses, no deficiencies, and represents a very low risk to the successful execution of the contract. Based on the analysis above, the Technical Evaluation Team rates Change Healthcare as Excellent." AR 866.

The Contracting Officer ("CO"), who was also the Source Selection Authority, reviewed the Panel's evaluation of the offerors' technical proposals and issued an initial Source Selection Decision Document ("First SSDD") on March 28, 2023.  AR 874–905.  The CO concurred with the Panel's assessment of Change's proposal as "Excellent."  AR 886–88.  Separately, the CO upgraded the ratings of SSI's and Availity's technical proposals from "Unacceptable" to "Acceptable," which is the minimum rating a technical proposal could receive for consideration for award.  AR 885–86, 890–91.  The CO explained that although both SSI and Availity had failed to provide an approach to the PWS Section 5.5 transition out requirement,

> ambiguity is introduced in the language the Government included in the PWS, paragraph 5.5, on page 15 in the 1st sentence where it states, "*If the Optional Task is exercised by VA, the Contractor shall provide a plan for outgoing transition support for transitioning work from the current effort to a follow-on procurement or Government entity.*"  Because of this ambiguity, the CO has determined not to consider this requirement in any of the four proposals as a strength or weakness, so that this ambiguity does not affect the evaluation of this procurement in any way.

AR 886 (emphasis in original); *see also* AR 891.

The CO evaluated price proposals to determine price reasonableness by comparing the total price for the base year and all options, including the FAR 52.217-8 Option to Extend Services.  AR 895–96.  To conduct the price reasonableness analysis, the CO utilized two evaluation methods prescribed in FAR 15.404-1(b)(2): (1) she compared the proposed prices received in response to the Solicitation, which per FAR 15.404-1(b)(2)(i) is the preferred technique; and (2) she compared the proposed prices with the Independent Government Cost Estimate ("IGCE"), consistent with FAR 15.404-1(b)(v).  AR 895.

Under the first comparison, the CO observed that SSI proposed the lowest total price at $[. . .], followed by Change, which proposed a total price of $[. . .].  AR 896.  Availity proposed the highest price at $[. . .].  *Id*.  The CO also compared all proposed prices to the lowest proposed price

received and the average of all proposed prices received.  AR 897.  In accordance with the Solicitation and FAR 52.217-8, the CO performed the same types of comparisons to account for the extension clause by adding half of the final option year to each offeror's total proposed prices. *Id*.  The CO then utilized the standard deviation from the average of the proposed prices to determine fair and reasonable pricing.  AR 898.  In each scenario, SSI and Change were the comparatively lowest priced proposals, while Availity was highest.  AR 897–99.  As such, the CO determined that the prices proposed by SSI and Change were fair and reasonable, but the price proposed by Availity was not.  AR 899.

The CO continued her price evaluation to ensure reasonableness by comparing each offeror's proposed prices with the IGCE.  *Id.*  She observed that SSI and Change were [. . .] percent and [. . .] percent below the IGCE, respectively, while Availity was [. . .] percent above.  *Id.*  Based on this analysis, the CO determined that the prices proposed by SSI and Change were again fair and reasonable, but the price proposed by Availity was not.  AR 900.  This determination matched the CO's ultimate price reasonableness determination for each offeror.  *Id.*

Based on her analysis of the evaluation of the price and non-price factors, the CO determined that an award to Change represented the best value for the Government.  AR 904–05. On April 3, 2023, the CO sent offerors post-award notifications, identifying Change as the successful offeror and advising unsuccessful offerors of their right to a post-award debriefing.  AR 1000–05.  SSI and Availity requested a debriefing, which the VA provided on April 10, 2023.  AR 1006–07, 1010–13, 1017–19.

During the course of this litigation, the VA took voluntary corrective action regarding the evaluations and issued a second Source Selection Determination Decision ("Final SSDD") on

September 14, 2023.  AR 1055–111.[2]  As part of the corrective action, the Panel reevaluated the

offerors' technical proposals.  AR 1066.  With regard to SSI, the Panel re-awarded it one strength

and one weakness which is not offset by a strength.  AR 1073.  The Panel expanded on its

identification of SSI's weakness for CAQH CORE response times, explaining:

> SSI stated on page 6 of their proposal that their direct "…real time solution
> consistently generates response times 10-15x faster than the CAQH CORE
> response limitation standard of 20 seconds" and their "hosted real time solution
> generates response times 20-30x faster than the CAQH CORE response limitation
> standard of 20 seconds".  In the case of the 270/271, one of the specifications is that
> there is a limitation of 20 seconds between the 270 transmission and 271 response
> transactions.  SSI stated that their direct real-time solution consistently generates
> response times 10-15X faster than the 20 second requirement.  Calculating this out
> means that SSI generates responses within 1.3 to 2.0 seconds.  The issue is that this
> time does not take into account the time required by VA to support this transaction
> – which is 3 seconds.  Given that VA needs 3 seconds to conduct our processing,
> there is no way that SSI can deliver a direct real-time solution less than 3 seconds
> as described in their proposal.  VA does not find this feasible as that implies a
> transaction timeframe of approximately two seconds; is impactable because SSI
> cannot control the provider or VA system response times.  SSI's fundamental
> misunderstanding of the "20 second" requirement increases the risk of unsuccessful
> contract performance.  VA considers this a weakness in SSI's understanding of this
> requirement.

AR 1072.  SSI's technical proposal retained its "Acceptable" rating.[3]  *Id.*

Separately, the Panel re-awarded Change's proposal seven strengths, no weaknesses, and

no deficiencies, with an overall rating of "Excellent."  AR 865–66.  The Panel also reassigned

Availity's technical proposal no strengths and two weaknesses, one for the Payer Identifier and

the other for the hosting requirements, giving it an overall rating of "Acceptable."  AR 1066–67.

---

[2] The Government filed a Supplement to the Administrative Record, consisting of the agency record of the Corrective Action and including the Final SSDD, on September 25, 2023. *See* ECF No. 56.

[3] The Panel also noted SSI's certification with CAQH CORE Phases I, II, III, and IV, which were submitted with SSI's proposal.  AR 1073.  This aspect of the Panel's evaluation is consistent with the Panel's first evaluation of SSI's proposal.  *Compare* AR 868 *with* AR 1072.

The Agency's corrective action also involved the CO conducting an unbalanced pricing evaluation in accordance with FAR 15.404-1(g).  AR 1077–90.  The CO performed mathematical assessments of individual CLINs, including assessment of: (1) yearly increases for option years two through nine compared to the IGCE; (2) individual CLIN prices proposed by each offeror against individual CLIN prices of the IGCE for option years two though nine; (3) price variances of high quantity CLINs against the IGCE for those same CLINs; and (4) understated prices.  *See id.*  Based on this analysis, the CO determined that the proposals from SSI, Change, and Availity had unbalanced pricing.  AR 1077–82.  The CO then assessed the risks of each proposal's unbalanced pricing, concluding that the unbalanced pricing in SSI's and Change's proposals was low risk, but the unbalanced pricing in Availity's proposal posed a "significant risk."  AR 1082–90.  The CO then re-evaluated price reasonableness, concluding that all proposals except for Availity's were fair and reasonable.  AR 1090–95.

The following is a summary of the findings for SSI's, Availity's, and Change's proposals based on the corrective action:

|  | **Availity** | **Change** | **SSI** |
|---|---|---|---|
| **Technical Rating** | Acceptable | Excellent | Acceptable |
| **Past Performance Rating** | High Confidence | High Confidence | High Confidence |
| **Socio-Economic Status** | Partial Credit | Minor Credit | Partial Credit |
| **Unbalanced Pricing-Risk** | Significant Risk | LOW RISK | LOW RISK |
| **F&R Pricing** | $[. . .] | $[. . .] | $[. . .] |

AR 1096. The CO again determined that Change's proposal represented the best value to the Government, explaining as follows:

Change Healthcare's proposal indicated an exceptional and comprehensive understanding of the requirement, receiving the only Excellent rating for the Technical Factor. Change Healthcare's technical proposal included numerous (six) strengths with no weaknesses or deficiencies and VA considers Change Healthcare's proposal a very low risk to the successful execution of this requirement. Change Healthcare represents the best overall proposal to the solicitation.

. . . SSI, which was rated as Acceptable for the Technical Factor, had one (1) strength and one (1) weakness which was not offset by a strength. SSI proposed the lowest price of all offerors at $[. . .], which is $[. . .] less than the next low offeror, Change Healthcare. In accordance with the solicitation, the Government may award the contract to an offeror other than the lowest offered price if a price premium is warranted. SSI may have proposed the lowest priced offer; however, SSI was rated as "Acceptable" for Factor 1 – Technical which was the most important factor. SSI's proposal, while acceptable, represents moderate risk to the Government for successful performance of this requirement. Additionally, SSI and Change Healthcare both received a High Confidence rating for Past Performance. SSI scored slightly higher on Factor 3 – Socio Economic Status, receiving partial credit compared to minor credit for Change Healthcare.

Change Healthcare was rated significantly higher, Excellent, than SSI for the Technical Factor. Change Healthcare proposed a technical approach that included six (6) strengths and no weaknesses while SSI proposed a technical approach with only one (1) strength and one (1) weakness . . . .

Based on the above analysis, although Change Healthcare proposed a higher price than SSI by $[. . .], the Government has determined that the significant strengths of Change Healthcare support the price premium, particularly noting the relative importance of the evaluation factors where the Technical Factor is significantly more important than the other factors.

The Technical Factor was stated in the solicitation to be the most significant. Change Healthcare received the highest rating for the most important Factor, Technical. Further, Change Healthcare is also the lower priced of the two (2) most highly rated technical proposals and as detailed above, warrants a price premium over the lowest priced offeror, SSI. As a result of both the non-price and price factor best-value trade-off analysis, Change Healthcare is hereby determined to represent the best value to the Government.

AR 1096–98.

On September 15, 2023, the CO sent offerors post-award notifications, once again identifying Change as the successful offeror and advising unsuccessful offerors of their right to a post-award debriefing.  AR 1110–23.

### D.    Procedural Background

On April 25, 2023, SSI filed the present protest challenging the VA's evaluation and award. SSI's Compl. at 1, *SSI Claimsnet, LLC v. United States*, No. 23-581, ECF No 1.  Availity filed a separate, directly-related protest on May 17, 2023.  Availity's Compl., *Availity v. United States*, No. 23-734, ECF No. 1.  The Court consolidated these parallel protests on May 19, 2023.  Order Granting Mot. to Consol. Cases at 1, ECF No. 30.  Pursuant to the Court's scheduling order, SSI and Availity filed Motions for Judgment on the Administrative Record on June 23, 2023.  *See* ECF Nos. 42, 43.  Each also filed a Motion to Supplement the Administrative Record, collectively seeking documents from a different solicitation, RFP 36C10G20Q0003 ("Solicitation 0003"); various documents related to Availity's protest of the contract awarded under Solicitation 0003; and the VA's Notice of Corrective Action dated November 11, 2021, related to Solicitation 0003. SSI's Mot. to Suppl. Admin. R. at 4, ECF No. 36; Availity's Mot. to Suppl. Admin. R. at 4, ECF No. 41.

After reviewing SSI's and Availity's initial dispositive motions, the Government filed an unopposed motion for voluntary remand to the VA for a period of 30 days to allow the Agency to reconsider the challenged award decision.  Def.'s Unopposed Mot. to Remand at 3, ECF No. 51. The Court granted the Government's remand request on August 15, 2023.  Remand Order at 2, ECF No. 52.  As discussed above, on remand, the VA reevaluated the Technical and Pricing factors and issued the Final SSDD on September 14, 2023, again awarding the contract to Change.  Def.'s Joint Status Report at 2, ECF No. 54; AR 1099.

On October 9, 2023, SSI and Availity each filed a Second Motion for Judgment on the Administrative Record.  *See* ECF Nos. 58, 59.  The Government and Defendant-Intervenor filed their responses and Cross-Motions for Judgment on the Administrative Record on October 23, 2023.  *See* ECF Nos. 60, 61.  Briefing concluded on November 28, 2023.  *See* Availity's Reply, ECF No. 62; SSI's Reply, ECF No. 63; Change's Reply, ECF No. 64; Def.'s Reply, ECF No. 65.  The Court held oral argument on December 14, 2023.  The motions are thus ripe for decision.

## II.   LEGAL STANDARDS

### A.   Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.   Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the

Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act. *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001). Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court may not substitute its judgment for that of the agency. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). The disappointed bidder "bears a heavy burden," and the Government is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory

allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In a bid protest, the Court reviews questions of law de novo. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The interpretation of a solicitation or of procurement regulations presents such questions. *See id.*; *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986). The Court of Federal Claims does not afford deference on questions of law. *See VS2, LLC v. United States*, 155 Fed. Cl. 738, 767 (2021).

## C.  Standing in a Bid Protest

To establish standing in a bid protest, the plaintiff is required to demonstrate that it is an interested party, meaning it "is an actual or prospective bidder[ ] and . . . possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To show a "direct economic interest," the plaintiff must show that it was prejudiced by the Government's alleged errors by proving it had a "substantial chance" of receiving the contract. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). Put differently, a plaintiff has standing to pursue a bid protest if it demonstrates that "but for the error[s]" challenged in the protest it "would have had a substantial chance of securing" the contract at issue. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval*, 175 F.3d at 1367.

In *CACI, Inc.-Federal v. United States*, the Federal Circuit held that § 1491(b)(1)'s interested party requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction.  67 F.4th 1145, 1151 (Fed. Cir. 2023).  According to *CACI*, the Court may thus choose—but is not required—to make an initial, "preliminary determination ('substantial chance') with respect to the plaintiff's chances of securing the contract" before addressing the merits.  *Id.* at 1152.  As the Circuit further observed, the statutory standing issue and the merits issue may overlap, especially where the plaintiff's protest challenges the agency's evaluation of its own bid.  *Id.* at 1152–53 (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012)).

## III.  DISCUSSION

### A.  Plaintiffs' Motions to Supplement the Administrative Record are Denied.

Plaintiffs' motions to supplement seek to add documents to the Administrative Record related to an earlier solicitation for similar services, Solicitation 0003, which was protested and subsequently cancelled.  *See* ECF No. 36 at 4; ECF No. 41 at 4–5; *see also* Def.'s Resp. to SSI's Mot. to Suppl. Admin. R. at 2, ECF No. 38 (explaining that Solicitation 0003 was cancelled after a series of bid protests).  Plaintiffs contend that these documents support their challenges to the VA's award decision in this case.  SSI argues that the VA's assessment of its technical proposal for the instant Solicitation was inconsistent with the VA's assessment of SSI's technical proposal for Solicitation 0003.  ECF No. 36 at 10–11.  Similarly, Availity argues that the VA's price analysis for the instant Solicitation was inconsistent with the VA's price analysis for Solicitation 0003.  ECF No. 41 at 9–10.  Plaintiffs contend that because the two solicitations are effectively the same procurement, these inconsistencies demonstrate that the VA's conclusions with respect to the present award decision are arbitrary and capricious.  *See* ECF No. 59 at 23 (describing Solicitation

17

0003 as "an earlier phase of this procurement"); ECF No. 62 at 5 (asserting the VA merely renumbered Solicitation 0003 when issuing the Solicitation in this case).

As the Federal Circuit has explained, the administrative record in a bid protest "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). When reviewing agency action under § 706 of the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142; *see Dep't of Commerce v. New York*, 139 S. Ct. 255, 2573 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record[,]" in "recognition that further judicial inquiry into 'executive motivation' represents a 'substantial intrusion' into the workings of another branch of Government and should normally be avoided.") (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)).

The question of whether to supplement the administrative record therefore depends on, among other things, the scope of the government action under review. If Solicitation 0003 and the Solicitation at issue here were part of a single government action (*i.e.*, procurement) subject to review under § 706, then supplementation may be appropriate. If, however, the solicitations related to separate government actions, then supplementation is not necessary to permit meaningful judicial review of the later, independent action. *See Axiom*, 564 F.3d at 1381. In the Court's view, this case presents the latter circumstance.

Regardless of the similarities between Solicitation 0003 and the Solicitation in this case, it is well settled that every procurement should be considered independently. *Ultra Elecs. Ocean Sys. Inc. v. United States*, 139 Fed. Cl. 517, 531 (2018) ("[E]ach procurement stands alone, and a

18

selection decision made under another procurement does not govern the selection under a different procurement.") (quoting *SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001)). Recognizing that principle, courts have repeatedly held that procurement decisions are considered and reviewed separately. *See Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 132 (2015) ("[E]ach procurement must stand or fall on its own administrative record."), *aff'd*, 657 F. App'x 1018 (Fed. Cir. 2016); *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 213 (2020) ("[E]very procurement stands on its own, and GSA is not bound by its actions in a previous procurement.") (holding that lease procurements for prior years that were not considered by the agency in a new lease procurement were irrelevant to the Court's assessment of the new lease procurement).

This rule holds even when there are similarities between two procurements. *Guardian Moving*, 122 Fed. Cl. at 132 ("Even if evidence about what had occurred during the prior procurement were part of the administrative record (which it is not), and even if such evidence revealed an inconsistency, it would be of no assistance to Guardian here because an agency is not bound by its actions in a previous procurement."). Thus, a change in the Government's view on precisely the same question, made in the context of a different solicitation, does not require any explanation. *Eskridge & Assocs. v. United States*, 142 Fed. Cl. 410, 424 (2019) (explaining that arguments based on a prior, cancelled solicitation for the same services were "immaterial" to a case challenging the new solicitation), *aff'd*, 955 F.3d 1339 (Fed. Cir. 2020).

The facts show that Solicitation 0003 and the Solicitation at issue in this case are two separate procurements. Contrary to Availity's assertions, the VA did not merely renumber Solicitation 0003 when issuing the Solicitation at issue in this case. The Administrative Record demonstrates that, following the cancellation of Solicitation 0003, the VA started anew. The

Agency issued a Sources Sought Notice – Request for Information (RFI) along with a draft PWS and RFI questions. *See* AR 1–39. In addition, it prepared an IGCE, Market Research Report, Acquisition Plan, and Source Selection Evaluation Plan prior to issuing the Solicitation challenged here. *See* AR 118–30; 131–45; 146–63.

What is more, even if the VA had issued a substantively identical solicitation only with a new number, Plaintiffs point to no authority suggesting that the new solicitation would be a part of the same procurement as the older solicitation. Plaintiffs principally rely on *KWR Construction, Inc. v. United States*, 124 Fed. Cl. 345 (2015). That protest involved multiple rounds of evaluation of the same proposal in response to the same solicitation. *Id.* at 348–54. But different agency assessments made in the course of the same solicitation is not analogous to the present circumstances. Here, Plaintiffs seek to supplement the record with evidence of a different solicitation in an attempt to undermine a separate assessment made in connection with a subsequent, independent solicitation. *KWR* therefore provides no basis for the Court to conclude that the two separate solicitations should be construed as part of the same procurement.

Because the Court concludes that Solicitation 0003 relates to a separate procurement, there is no need to supplement the Administrative Record with materials related to Solicitation 0003 to facilitate meaningful judicial review of the Solicitation at issue in this matter.

**B.    SSI's Motion for Judgment on the Administrative Record is Denied.**

SSI challenges the VA's award to Change on three grounds. It alleges that: (1) the VA misconstrued SSI's proposal in assessing a weakness for SSI's stated response speed; (2) the VA treated SSI disparately by failing to award SSI a strength that the VA awarded Change for a substantively similar aspect of Change's proposal; and (3) the VA's best value determination was arbitrary and capricious. As explained below, the Court finds that SSI has failed to demonstrate

that the VA's evaluation of its proposal lacked a rational basis, except with respect to SSI's disparate treatment claim. However, the Court also finds that SSI has not demonstrated that it was prejudiced by that error because, even if SSI were assigned an additional strength for its technical proposal, SSI would not have a substantial chance of receiving the award.

1.   The VA Rationally Assigned SSI a Weakness for Its Stated Response Speed.

With regard to the Technical Approach sub-factor (1A), SSI challenges the VA's assignment of a weakness for its stated transaction response speed. SSI raises three arguments: (1) the VA erroneously penalized SSI for an accurate statement about SSI's own response speed; (2) the VA failed to explain how SSI's alleged weakness creates performance risk; and (3) the Agency's assessment of the weakness relied on unstated evaluation criteria.[4] ECF No. 59 at 17–18. The Court addresses each in turn.

SSI alleges that the VA's assignment of a weakness to SSI was arbitrary and capricious because the agency unreasonably concluded that SSI's direct real-time solution was infeasible. ECF No. 59 at 18–19 (citing AR 1072). The Solicitation stated that each offeror's technical proposal would be evaluated to determine "[t]he extent to which the Offeror's proposed technical approach is feasible, practicable, and that the end results are achievable to meet and/or exceed the requirements of Section five of the PWS." AR 272. In turn, the PWS provided the requirements regarding the specifications for hosted transactions (PWS Section 5.2.1) and direct transactions (PWS Section 5.2.2).[5] AR 367. The PWS also incorporated the CAQH CORE Connectivity Rules

---

[4] Because the Court has concluded that Solicitation 0003 relates to a separate procurement and is thus irrelevant to the resolution of this protest, it need not consider SSI's additional argument that the VA acted arbitrarily and capriciously by "changing position" in the present evaluation with respect to "substantively identical proposal content" from SSI's proposal for Solicitation 0003. ECF No. 59 at 23.

by reference.  AR 370 ("The contractor shall provide connectivity that is compliant with the appropriate [CAQH CORE] rules.").  Section 4.2 of the CAQH CORE Rules provides for a 20-second maximum roundtrip transaction response time.  It further states:

> Each CORE-certified entity must demonstrate its conformance with this maximum response time rule by demonstrating its ability to capture, log, audit, match and report the date (YYYYMMDD), time (HHMMSS) and control numbers from its own internal systems and the corresponding data received from its trading partners . . . .  The recommended maximum response time between each participant in the transaction is 4 seconds or less per hop as long as the 20-second total roundtrip requirement is met.

Pl.'s Second Mot. for J. on the Admin. R. Ex. 4 at 8, ECF No. 59-4.  Further, the Solicitation's instructions advised that each offeror's technical proposal "shall demonstrate an understanding of the technical requirements to assure the Government that the Offeror can perform mission-critical support services exemplified by appropriate resources to execute the [PWS]."  AR 266.

SSI first argues that the VA erroneously penalized SSI for an accurate statement about its own response speed.  ECF No. 59 at 18–19.  SSI's proposal stated that "[t]he SSI [direct] real time solution consistently generates response times 10-15x faster than the CAQH CORE response limitation standard of 20 seconds," and its "[h]osted real time solution generates response times 20-30x faster than the CAQH CORE response limitation standard of 20 seconds[.]"  AR 802.  The VA assigned a weakness to SSI for this sub-factor, finding it infeasible, impracticable, and an indication of "fundamental misunderstanding of the '20 second' requirement" that "increase[d] the risk of unsuccessful contract performance."  AR 1072.

SSI contends that its proposal only addressed its own speed in relation to the 20-second requirement (*i.e.*, the response times between it and other participants), not the speed of the total

---

[5] The Solicitation also referred to both the hosted transactions and the direct transactions as 270/271 transactions.  AR 367.

roundtrip transaction.  ECF No. 59 at 18–19.  SSI supports this argument by pointing to CAQH CORE Rules Section 4.2 to assert that an entity such as SSI can only control its own compliance with the response time requirement, and not any other entity participating in the transaction (*e.g.*, the VA).  *Id.* at 18 (citing Pl. Ex. 4, CAQH CORE Rules § 4.2 (ECF No. 59-4)).  SSI argues that to be compliant with Section 4.2 its proposal could reasonably be interpreted to state only the speed with which its own solution consistently operates.  *Id.* at 18–19.  SSI further alleges that the VA ignored Exhibit 7 of SSI's proposal, a schematic titled "Real Time Clearinghouse Workflow," which indicated that the payer (*i.e.*, the VA) may require an additional "4-5 second response" to complete its portion of the roundtrip transaction—time that is clearly not captured in the roundtrip transaction estimate if SSI meant it could complete a roundtrip transaction in less than approximately two seconds.  *Id.* at 19.

In opposition, the Government argues that the VA rationally assigned a weakness based on SSI's proposed response time.  According to the Government, by claiming that the "SSI real time solution" could generate response times 10-15x faster than the 20-second requirement, SSI's representation implied a total roundtrip transaction time of approximately two seconds because the CAQH CORE 20-second requirement applies to the total roundtrip response time for such transactions.  ECF No. 61 at 30.  Since SSI cannot control other components of the 270/271 transaction, such as the provider or the VA's system response times, the Agency found SSI's representation to be infeasible and a fundamental misunderstanding of the CAQH CORE 20-second requirement altogether.  *Id.*

On this point, the Agency prevails.  SSI's proposal did not clearly explain whether the phrase "SSI real time solution" referred to its own response speed or the response speed of the total roundtrip transaction.  In the context of a solicitation seeking a contractor to support roundtrip

P2E/EDI transactions, it was not unreasonable for the VA to construe a broad reference to "SSI's real-time solution" as a representation about the response time for roundtrip transactions. That is especially true where SSI described the solution's response speed by comparison to "the CAQH CORE response limitation standard of 20 seconds," which expressly applies to roundtrip transactions. AR 802. SSI bore the burden "to submit a well-written proposal with adequately detailed information that allow[ed] for a meaningful review" by the VA. *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009). And the Agency's assessment of SSI's response speed and its potential risk to contract performance are matters committed to the VA's discretion and expertise, which the Court will not second guess. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (noting that arguments "deal[ing] with the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second-guess").

Contrary to SSI's argument, the VA was not required to piece together vague information from an exhibit embedded within SSI's proposal to determine SSI's intended meaning. *See Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 213 (2019); *ASRC Fed. Tech. Sols., LLC v. United States*, 169 Fed. Cl. 372, 387 (2024) ("[The agency] was not required to infer such information from proposals where the information was inadequately provided or omitted."). "Courts have frequently recognized that a procuring agency is not expected to hunt for potentially responsive information that is not included or not adequately presented in the relevant section of an offeror's proposal." *AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 360 (2023) (citing *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 110 (2013)). This protest is no exception.

Here, SSI points to a workflow diagram in Exhibit 7, included on the next page of its proposal.  AR 803.  The exhibit is not cited in the relevant portion of the proposal discussing the response time for the "SSI real time solution."  AR 802.  It does refer to a "4-5 second response" between "Core Web Services" and "Secure Payer Connectivity," but it does not refer to the 10-15x-faster response time discussed earlier in the proposal.  AR 803.  Instead, with respect to response times, it indicates only that "Real Time Hosting" is "6x Faster Than Traditional Payer Responses."  *Id.* (emphasis in original).  Given the lack of connection or clear overlap between the proposal language at issue and Exhibit 7, the Court does not agree that the VA unreasonably interpreted SSI's proposal, and SSI's "mere disagreement" with the VA's judgment is not sufficient to show that the VA's evaluation was arbitrary or capricious.  *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd* 365 F.3d 1345 (Fed. Cir. 2004).

SSI next contends that the VA failed to explain how the weakness assigned to SSI for its stated response speed created performance risk.  ECF No. 59 at 19–21.  According to SSI, its response speed satisfies the Solicitation requirement, and the VA did not "provide any link between SSI's alleged weakness and a potential failure to meet the performance requirements set forth in the Solicitation."  *Id.*  In contrast, the Government argues that "[t]he agency's path to its conclusion that SSI's fundamental misunderstanding of the 20-second requirement increases the risk of unsuccessful contract performance may reasonably be discerned from the agency's detailed explanation[.]"  ECF No. 61 at 32.

As described above, the ambiguity in SSI's proposal caused the Agency to question the feasibility and practicality of SSI's proposal, since it implied SSI could complete the roundtrip 270/271 transaction in approximately two seconds.  *See* AR 1072.  The VA did not assess a weakness to SSI for exceeding the maximum response time as a participant in the 270/271

transaction (*i.e.*, not satisfying the 20-second requirement), and SSI was not penalized for not knowing the VA's response time.  Rather, SSI received a weakness because of its "fundamental misunderstanding of the '20 second' requirement."  *Id.*; AR 266 ("The Offeror's Technical Approach shall demonstrate an understanding of the [technical] requirements to include the ability to . . . provide . . . feasible solutions to the requirements of the PWS, Section 5[.]")[6]  It is self-evident that understanding a Solicitation's requirements is part and parcel to performing them successfully.  Indeed, the VA's adjectival ratings for its technical evaluation specifically included an assessment of the offerors' "understanding of requirements" in connection with assessing performance risk.  *See* AR 179.  Since the VA squarely addressed and rationally explained its evaluation, its judgment should not be second guessed.  *See E.W. Bliss*, 77 F.3d at 449.

Lastly, SSI argues the VA relied upon unstated evaluation criteria in its assessment of SSI's technical proposal.  ECF No. 59 at 21–22.  According to SSI, the Agency allegedly penalized SSI for not knowing the amount of time it takes for the VA to complete its portion of the roundtrip transaction, even though this information was not disclosed to any offeror.  *Id.* at 22.  SSI bolsters this argument by noting that the Solicitation did not require contractors to perform the VA's portion of the roundtrip transaction and that Section 4.2 of the CAQH CORE Rules does not require or assume that a healthcare clearinghouse has any control over another party in the transaction, such as a payor or provider.  *Id.*  This argument also fails.

"[F]or a plaintiff to succeed on a claim of undisclosed evaluation criteria, it must show that the procuring agency used a 'significantly different basis in evaluating the proposals than was disclosed' in the solicitation."  *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536–37 (2010)

---

[6] This provision appears in the Solicitation's Instructions to Offerors, which were incorporated by reference into FAR 52.212-1 as an addendum to the Solicitation.  AR 261.

(quoting *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009)).  Here, the Agency evaluated SSI's proposal, including SSI's stated response time, in accordance with the Solicitation to determine the feasibility of its technical approach and its understanding of the technical requirements.  AR 179, 266, 1072.  The VA's own three-second response time would have been irrelevant but for SSI's claim that it could generate response times 10-15x faster than the 20-second requirement, which caused the VA to question SSI's understanding of the requirement in the first place.  Accordingly, the VA did not apply unstated evaluation criteria in its assessment of a weakness for SSI's response speed.  *See Banknote Corp.*, 365 F.3d at 1357 (declining to read an additional evaluation criterion into a contracting officer's statements "merely explain[ing] the strengths and weaknesses of the offerors' proposals").

## 2. The VA Treated SSI Unequally Regarding a Strength It Assigned to Change.

SSI's second protest ground fairs better.  It argues that the VA unequally evaluated Technical sub-factor 1C of SSI's technical proposal when compared to Change's proposal.  ECF No. 59 at 27–29.  Specifically, SSI contends that the VA improperly credited Change—but not SSI—with a strength regarding involvement in CAQH CORE workgroups.  *Id.*  The Government and Change disagree, claiming SSI's and Change's technical proposals were not substantively indistinguishable.  ECF No. 60 at 47–47; ECF No. 61 at 36–37.

It is well established that procuring agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria."  *Banknote Corp.*, 56 Fed. Cl. at 1352 (citing *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 569 (2000)).  To prevail on a disparate treatment claim, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" from or "nearly identical" to those contained in other proposals.  *Office Design Grp. v. United States*, 951

F.3d 1366, 1372 (Fed. Cir. 2020) (citing *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)); *Red River Comput. Co. v. United States*, 120 Fed. Cl. 227, 238 (2015).  The same standard applies when a protestor alleges an agency unequally assessed strengths in offerors' proposals.  *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 290–91 (2022) ("[T]the inquiry on a disparate evaluation claim is the same whether the disparate evaluation involves a strength, weakness, or deficiency: the Court is examining whether there is something in the protestor's proposal that is different from one or more other proposals that is rated higher.").  "When a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for the purposes of the evaluation," the claim must be rejected because "then the exercise crosses the line and involves the second guessing of 'minutiae' which [courts] are not allowed to undertake."  *Enhanced Veterans Sols.*, 131 Fed. Cl. at 588 (quoting *E.W. Bliss*, 77 F.3d at 449).

As relevant to this protest, the Solicitation required "proof of certification of the Offeror's compliance with current [CAQH CORE] rules including the ability to maintain this accreditation and compliance with future mandates throughout the life of the contract[.]"  AR 272.  Under Technical sub-factor 1C, the VA would evaluate such information to determine the offeror's "previous, current, and future demonstrated ability to obtain and maintain [CAQH CORE] certification[.]"  AR 180.  SSI's proposal stated that:

> SSI continues to be an *active participant* in the CAQH CORE process. SSI *participates in both committee and sub-committee meetings*, both in person and virtually. This participation ensures that SSI is *not only aware and monitoring* discussions about changes, new rules, and new use cases, but SSI *is also in the conversation* with other clearinghouses, health plans, and providers.  It's important [for] us to be engaged in this process so that *we can help the process find the best rules and use cases for the healthcare industry*.

AR 818 (emphasis added).  SSI did not receive a strength for this portion of its proposal.  *See* AR 1072.

By comparison, Change's proposal stated the following:

[W]e are a founding and longstanding CAQH CORE member participant. We *actively participate and contribute to CORE priority topics and work group efforts*, such as the Connectivity Operating Rule Evaluation and Update, Additional Medical Documentation/ Attachments, and Prior Authorization.

AR 636 (emphasis added).  The Panel awarded Change a strength because "Change Healthcare stated on page 25 of the proposal that they actively participate and contribute to CORE priority topics and work group efforts[.]  This provides VA with the opportunity to query Change Healthcare of proposed changes and the opportunity to shape these changes to better serve Veterans."  AR 1070.

The Court agrees with SSI that both SSI's and Change's proposals stated that each contractor actively participates in CAQH CORE rulemaking activities and has the ability to help shape rule changes.  Although the proposals did not use the exact same language, the substance is indistinguishable.  SSI stated that it participates in CAQH CORE committees and subcommittees, while Change participates with CAQH CORE priority topics and work group efforts.  *Compare* AR 818 *with* AR 636.  SSI further stated that it not only monitors rulemaking discussions but is also "in the conversation," AR 818, while Change stated it "contributes" to the priority topics and work group efforts, AR 636.  The Court cannot discern a substantive difference between Change's and SSI's participation in and contribution to the CAQH CORE process that would justify the VA assessing a strength to Change—but not SSI—based on its awareness of and ability to help shape rule changes. *See Golden IT, LLC v. United States*, 165 Fed. Cl. 676, 688 (2023) (finding disparate evaluation where the protestor's proposal received a deficiency for prior Salesforce and Sharepoint

29

experience, when other offerors were not penalized for similar references to Salesforce and Sharepoint experience).

The Government argues that the proposals were not substantively indistinguishable because Change's active participation and contribution to CAQH CORE issues/groups is "significantly different" from SSI only being an active participant.  ECF No. 61 at 37.  But the Government does not address SSI's representation that it does not just participate in the process but is also "in the conversation," AR 818, or explain how being "in the conversation" is significantly different than "contributing."  Change hones in on information regarding "the specific priority topics and working groups with which [Change] is involved," noting that the same details are missing from SSI's proposal.  ECF No. 60 at 46–47.  Change argues that these details would allow the VA to evaluate the relevance of Change's participation and contribution.  *Id.* at 47.  But the CO did not rely on such details to explain why the VA considered Change's participation and contribution to the CAQH CORE process a strength.  The decision only cited generally to Change's statement that it "actively participate[s] and contribute[s] to CORE priority topics and workgroups" and the benefits (*i.e.*, opportunity to query and shape proposed changes) that would flow to the VA.  AR 1070.  Yet SSI's proposal conveyed that it also actively participates and contributes and thus could provide the same benefits, which the VA did not acknowledge.  That the VA did not award a strength to SSI on this ground, as it did to Change, amounts to unequal treatment of SSI's technical proposal.

3.  The VA's Best Value Determination Was Not Arbitrary and Capricious

SSI's final objection to the VA's evaluation addresses the CO's best value determination. In addition to alleging that the VA erred in its evaluation of SSI's technical proposal, SSI claims that the VA did not explain, beyond mere references to Change's adjectival ratings and a list of its

strengths, why Change's higher-priced proposal presented a better value to the Government than SSI's lower-priced proposal.  ECF No. 59 at 29–34.  The Administrative Record does not bear out that claim.

An agency's award decision is "least vulnerable to challenge when based upon a best value determination." *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).  "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449; *see also Banknote Corp.*, 365 F.3d at 1355–56 ("[C]ontracting Officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."). Accordingly, "a best-value determination should not be disturbed so long as the agency documents its final award decision and includes a reason for any business judgments and tradeoffs made." *Vertex AeroSpace, LLC v. United States*, 142 Fed. Cl. 755, 776 (2019).

The CO independently evaluated each offeror's proposal in accordance with the Solicitation and determined that Change's proposal represented the best value to the Government. AR 1066–73, 1098.  Importantly, in her best value, trade-off analysis of Change's and SSI's proposals, the CO made several key observations.  First, Change's and SSI's proposals were the lowest priced of the four proposals, and SSI's price was $[. . .] lower than Change's price.[7]  AR

---

[7] SSI argues that the VA failed to recognize the true price differential between Change and SSI because the SSDD references the offerors' proposed prices, which did not include the six-month option to extend services.  ECF No. 59 at 30.  The record does not support this assertion. The RFP provided that "[t]he Government will evaluate offers for *award purposes* by adding the total price for all options to the total price for the base requirement."  AR 269 (emphasis added). The Final SSDD's "Best Value Determination" section correctly included analysis of the offerors' proposed prices, which utilized the total prices reflected in each offeror's proposal.  *See* AR 1093–94 (reflecting that Change's proposed price was $[. . .] and SSI's proposed price was $[. . .]).  As part of the VA's price evaluation, but not for award purposes, the Final SSDD includes analysis

1097–98.  Second, for the most important factor, the Technical factor, Change received the highest

rating of "Excellent" whereas SSI received only an "Acceptable" rating.  *Id*.  As such, Change's

proposal represented a very low risk to the successful execution of the contract whereas SSI's

technical proposal represented a moderate risk to the Government for successful performance of

the contract.  *Id*.  Third, Change's technical approach was awarded six strengths and had no

weaknesses, and SSI's technical approach was assessed one strength and one weakness. *Id*.

The CO offered further explanation regarding Change's technical proposal:

Change Healthcare proposed a detailed description of how they would perform all
the requirements of the PWS in their proposal including a detailed plan on how
successful execution of the P2E requirements would be performed, can support [. .
.] unique VA users, delivering an impressive [. . .]% system up time which allows
VA to expand its user base as necessary, demonstrated extensive knowledge of VA
practices throughout the proposed description of how the future 277PEND
transaction could be implemented, demonstrated abilities in excess of the
requirements of the PWS through their efforts to educate by publishing
approximately 400 separate Customer Service Announcements for VHA IVC on
VA policy in order to reduce unnecessary support tickets that are transmitted to
VA, demonstrated a strength in key personnel, and maintains active positions in the
ENHAC Commissioners, Criteria, and Marketing Committees.

AR 1097.

Based on this analysis, the CO determined that, "although Change Healthcare proposed a

higher price than SSI by $[. . .], the Government has determined that the significant strengths of

Change Healthcare support the price premium, particularly noting the relative importance of the

evaluation factors where the Technical Factor is significantly more important than the other

factors."  AR 1098.

---

of the VA's option to extend services, which was calculated per FAR 52.217-8 "by adding to the
total proposed price a sum of one-half of the offeror's final option period."  AR 270 (reflecting
that Change's proposed price plus six-month extension was $[. . .] and SSI's proposed price was
$[. . .]).  Thus, the VA properly conducted its best value determination with respect to price and
its price evaluation according to the RFP.

Just as the Court finds nothing arbitrary or capricious about the challenged evaluation findings (other than the disparate treatment claim), it likewise finds nothing irrational about the VA's best value determination, which was thoroughly explained in the Final SSDD. *See* AR 1098–99. In a best value procurement, agencies have even greater discretion to determine the proper award than if the contract was awarded upon the basis of cost alone. *Galen Med. Assoc.*, 369 F. 3d at 1330. Here, the CO's best value analysis considered the relevant evaluation factors and provided a rational basis for her conclusion that Change's proposal presented the best value to the Government based on its technical advantages.

4.    <u>SSI Was Not Prejudiced by the VA's Error.</u>

Having found that the VA acted arbitrarily with respect to its evaluation of Technical Sub-factor 1C, the Court must consider whether SSI was prejudiced by the VA's error. *See Bannum*, 404 F.3d at 1351. For SSI to prevail, it "must show prejudicial error." *Glenn Def. Marine (Asia), PTE, Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013). There is no presumption of prejudice upon a showing that an agency acted irrationally. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021). To establish prejudice, SSI must show that "but for the alleged error, there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (quoting *Statistica*, 102 F.3d at 1581); *see also CACI*, 67 F.4th at 1151 (citing *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); *Rex Serv.*, 448 F.3d at 1308.

The Court finds that SSI has not demonstrated that it was prejudiced by the VA's error. The VA assigned SSI an "Acceptable" rating for its technical proposal, based on one strength and one weakness which was not offset by a strength. AR 1097. Change, on the other hand, received

an "Excellent" rating for its technical proposal and was assigned six strengths and no weaknesses. *Id.* If the VA were to conduct a reevaluation of SSI's and Change's technical proposals to cure the unequal treatment, SSI could receive another strength for its CAQH CORE involvement. SSI argues that this additional strength "would have reduced the perceived technical superiority of [Change]," giving SSI a substantial chance of "tipp[ing] the tradeoff balance in SSI's direction." ECF No. 59 at 28–27. But SSI has not presented facts to support that conclusory argument, and such claim is not supported by the record.

As explained above, the CO's best value determination identified several factors of Change's technical proposal that, in the CO's judgment, made Change the best overall proposal and the best value to the Government. That Change received the highest rating for the Technical factor, which was the most important factor, based on six strengths formed a large part of her determination. *See* AR 1096–98. However, in describing the strengths of Change's technical proposal that warranted a price premium, the CO did not identify Change's CAHQ CORE involvement at all. *See* AR 1097. Nor did she mention it in the decision section of the Final SSDD. *See* AR 1098–99. CAHQ CORE involvement appears, therefore, not to have had a substantial place in the CO's tradeoff analysis. If the VA had awarded SSI with a strength for its CAHQ CORE involvement, it is not likely SSI would have had a substantial chance of receiving the contract, since the same strength did not factor prominently in the CO's award decision. Accordingly, SSI has not demonstrated prejudice.

## C.    Availity's Motion for Judgment on the Administrative Record is Denied.

Availity challenges the VA's price analysis, unbalanced pricing analysis, and technical analysis. Specifically, Availity objects to the methods the VA used when assessing whether offerors' prices were fair and reasonable and argues that the VA made numerous errors in its

unbalanced pricing analysis. Availity further argues that the VA erred in assessing it weaknesses based on Availity's failure to include sufficient information regarding two technical requirements. For the reasons discussed below, the Court rejects all three challenges.

1.   The VA's Price Reasonableness Analysis Was Both Rational and Consistent with the Solicitation and the FAR.

Availity argues that the VA's price reasonableness analysis was arbitrary and inconsistent with the Solicitation. Availity's Mem. in Support of Second Mot. for J. on Admin. R. at 22, ECF No. 58-1. Under the FAR, an agency has "discretion to choose the test it uses when conducing a price reasonableness analysis to ensure that the agency pays a fair and reasonable price." *ASRC Fed. Tech. Sols.*, 169 Fed. Cl. at 389; *see also DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1316 (Fed. Cir. 2021). Here, the Solicitation did not specify the methods the VA would use to perform a price reasonableness analysis. However, the CO explained that she would determine whether the proposed prices were fair and reasonable based on two methods: "[c]omparison of proposed prices received in response to the solicitation" and "[c]omparison of proposed prices with independent [government] cost estimates." AR 1091 (citing FAR 15.404-1(b)(2)(i), (b)(2)(v)).

Availity takes issue with the CO's assessment, contending that the CO erred "by simply averaging the numbers and comparing to the IGCE, which led to unreasonable results." ECF No. 58-1 at 23. The record before the Court does not support that contention. Rather, the record demonstrates that the CO conducted a thorough analysis that adhered to both the Solicitation and the FAR. First, the CO compared each proposed price from all four offerors, ranking them from highest (Availity) to lowest (SSI). AR 1091–92. She then compared all proposed prices to the lowest proposed price and, due to the variation among the proposed prices, to the average proposed price of all four offers. AR 1092. The CO also, consistent with the Solicitation, considered the

cost of extending services "by adding half of the final option year to the total proposed price." *Id.*; *see* AR 273. Similar to her analysis of total proposed price, she compared the price of each proposal with a six-month extension to the lowest offer and to the average of all four proposals with such an extension. AR 1093. Finally, the CO determined which price proposals were more than one standard deviation greater than the average price of the proposals. *Id.* Under each of these calculations, Availity was far and away the high-end outlier. *See* AR 1091–93 (charts showing Availity's total proposed price (including with the six-month extension) was the highest, being approximately [. . .] percent higher than the lowest price and approximately [. . .] percent above the average price). Indeed, Availity's proposal was more than one standard deviation greater than the average, while the other three offerors fell below that threshold. AR 1094. Based on these findings, the CO rationally concluded that Availity's price was not fair and reasonable. *Id.*

However, the CO did not stop there, as she "determined that further price evaluation was warranted to ensure price reasonableness." *Id.* To that end, the CO compared each proposed price with the IGCE. *Id.* Availity's price was nearly [. . .] percent greater, whereas the three other offers fell below the IGCE. *Id.* Based on that finding, the CO again reasonably concluded that Availity's price was not fair and reasonable. AR 1095.

Availity further argues that the CO failed to adequately consider and address discrepancies among the proposed costs for CLINs across proposals, as well as discrepancies among the top line numbers. ECF No. 58-1 at 23. As a threshold matter, nothing in the Solicitation or FAR required the VA to expressly consider discrepancies among the prices. Even so, the CO did consider and address discrepancies among the top-line prices by taking the standard deviation of the data set to determine which proposals, if any, were outliers. AR 1093–94. Similarly, there was no requirement that the VA compare prices at the CLIN level. Rather, the Solicitation provided that

price reasonableness be evaluated based on "the total price for the Base Period in addition to the total price for all Options," not line items.  AR 273.  The CO's analysis was thus consistent with the Solicitation.[8]  AR 273, 1090–95.

Accordingly, Availity has not met its burden on this protest ground.  Because the Solicitation expressly advised that the VA would "not establish a contract with any Offeror whose price is found to be unreasonable," the VA's price reasonableness determination disqualified Availity from award.  AR 263.  As such, even if Availity were to show that the VA erred with respect to its other protest grounds, Availity would not be able to demonstrate that any error was prejudicial.  *See Alfa Laval*, 175 F.3d at 1367.  Although the Court could therefore end its review here, it will nonetheless explain why Availity's additional objections fail.

      2.    <u>The VA Rationally Concluded that Availity's Unbalanced Pricing Posed a Significant Risk and that Change's Unbalanced Pricing Did Not.</u>

Availity argues that the VA erred in its unbalanced pricing analysis.  With respect to its own proposal, Availity challenges the VA's conclusion that Availity's pricing was unbalanced and posed a significant risk.  ECF No. 58-1 at 18; ECF No. 62 at 7–8.  As to Change, Availity argues that the VA should have concluded that Change's proposal had unbalanced pricing.  ECF No. 58-1 at 18–22, ECF No. 62 at 8–10.

To determine whether there is unbalanced pricing, the Government assesses whether "the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques."  FAR 15.404-1(g)(1).  In cases where offers have separately priced line items, those items "shall be analyzed to determine if the prices are unbalanced."  FAR

---

[8] Availity additionally argues that the VA's price analysis was inconsistent with its price assessment of proposals for Solicitation 0003.  ECF No. 58-1 at 23–24; ECF No. 62 at 7.  As previously discussed, Solicitation 0003 was a separate procurement that is irrelevant to the Court's analysis of the award decision for the Solicitation at issue in this case.  *See supra* § III.A.

15.404-1(g)(2).  If applying cost or price analysis techniques to the assessment of those line items indicates that an offer is unbalanced, the procuring agency must "[c]onsider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection," and "[c]onsider whether an award of the contract will result in paying unreasonably high prices for contract performance."  FAR 15.404-1(g)(2)(i)–(ii).  The agency can reject any offer where "the lack of balance poses an unacceptable risk to the Government."   FAR 15.404-1(g)(3); *see also* AR 273 ("The Government may reject any offer that is materially unbalanced as to prices.").

Availity argues that the CO could not reasonably conclude that Availity's proposal was unbalanced without first assessing whether the proposal was "front-loaded."  ECF No. 62 at 7–8.  Availity principally relies on the following quote from *Munilla Construction Management, LLC v. United States*: "[T]he risk depends on whether there is 'front loading': unbalanced pricing between the initial years and subsequent option years."  130 Fed. Cl. 635, 652 (2017).  In *Munilla*, the court held that the Government was not required to assess individual CLINs for unbalanced pricing because, "in the context of a firm fixed-price contract, the risk to the government of unbalanced prices does not hinge upon whether specific line items are overpriced or underpriced within a single performance period."  *Id.*  The court held that, in that context, the agency reasonably concluded that a proposal was unbalanced by assessing front-loading.  *Id.*  The court did not, however, hold that front-loading was the *only* means by which an agency could assess whether a proposal is unbalanced, even for firm fixed-price contracts.  *Id.*

As an initial matter, Availity's front-loading argument is inconsistent with the assertions Availity makes in its challenge to the CO's analysis of Change's proposal.  In that context, Availity argues that the CO should have assessed unbalanced pricing by comparing CLIN prices across

proposals—not by assessing whether Change's proposal was front-loaded.  *See* ECF No. 58-1 at 19–21.  Indeed, neither the FAR nor the Solicitation indicate that front-loading is or would be the primary mode of assessing whether proposals have unbalanced pricing.

In this case, consistent with the FAR, the CO assessed whether line items were overstated or understated using price analysis techniques.  AR 1077–82; *see* FAR 15.404-1(g)(1).  The CO first compared the rates at which the price of each proposal's option years grew.  AR 1078.  Availity's increased [. . .] percent—[. . .] percent more than the next highest rate of increase.  *Id.*  In addition, the CO compared these rates to the rate at which the IGCE escalated.  *Id.*  The CO concluded that Availity's price escalated at a "significantly higher rate."  *Id.*  Though the significantly higher rate of escalation was a point of concern, the CO proceeded to assess whether the pricing was unbalanced based on an assessment of the CLINs.  *Id.*  After comparing the CLINs of each proposal against the IGCE for each CLIN, the VA noted that all offerors appeared to have overstated or understated pricing as compared to the IGCE.  AR 1079–80.  For that reason, the CO also analyzed the "CLINs which may pose the greatest risk of unbalanced pricing to the agency – the high quality CLINS."  AR 1080.  The CO then compared each proposal to the IGCE for five high quality CLINs.  AR 1081.  The CO found that Availity's proposal had unbalanced pricing because four out of five high quality CLIN's appeared to be overstated, and the fifth high quality CLIN was [. . .] percent less than the IGCE for that CLIN.  *Id.*

The CO next assessed whether the unbalanced pricing in Availity's proposal created an unacceptable risk.  AR 1082.  The CO concluded that the overstatement of three high quality CLINs "present[ed] a risk of paying too high a price to the vendor for these tasks."  *Id.*  By contrast, analyzing the two remaining high quality CLINs (CLIN X013 and CLIN X015) together, "because the[] tasks [we]re closely related," the CO concluded that Availity's cumulatively overstated price

for those CLINs did not create a risk of overpayment.  AR 1083.  Though CLIN X013 was understated by [. . .] percent and CLIN X015 was overstated by [. . .] percent, taken together, the CLINs were [. . .] percent greater than the IGCE.  AR 1082.  The CO concluded that a [. . .] percent overstatement did not pose a risk of overpayment because the VA considered a price difference of less than [. . .] percent to be a nominal amount.  AR 1083.  But, based on the overstated price for the other three high quality CLINs, the CO concluded that Availity's unbalanced, overstated pricing created a significant price risk.  AR 1089–90.  The record demonstrates that the VA's assessment of Availity's proposal adhered to the relevant FAR provisions, as well as the terms of the Solicitation.

Availity also argues that the VA erred in its risk evaluation of the unbalanced pricing in Change's proposal.  Specifically, Availity objects to the VA's analysis of CLIN X013 and CLIN X015.  Availity's arguments on this point rely on the premise that the CO should have considered these CLINs separately.  According to Availity, if the CO had assessed each CLIN separately, the CO would have found that the pricing for each CLIN was unbalanced.  *See* ECF No. 58-1 at 19; ECF No. 62 at 8.  But neither the FAR nor the Solicitation prevents the VA from considering two CLINs together.  As explained above, the CO combined CLIN X013 and CLIN X015 when assessing whether the proposals had unbalanced pricing for those line items because the tasks were closely related.  AR 1082.  The Court finds nothing unreasonable about that approach, which was well within the CO's discretion to take.  *See E.W.*, 77 F.3d at 449.  Because Availity's challenge relies on the false premise that the two CLINs must have been considered separately, the Court has no basis to conclude that the CO erred in her consideration of the unbalanced pricing in Change's proposal.

Even assuming that these two CLINs should have been considered separately, Availity cannot establish prejudicial error.  "Unless the risks from unbalanced pricing appear obvious from the record," which they do not, Availity "bears some minimal burden of explaining what risks the government ignored such that, had they been properly considered, the contracting officer's best value determination may have been altered." *Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189, 214 (2022) (citing *Sys. Stud. & Simulation*, 22 F.4th at 998).  Availity neither addresses nor explains how unbalanced prices in Change's proposal create any risk to the VA.  Availity appears to argue that, because Change's pricing for CLIN X015 was unbalanced, it "should be thrown out." ECF No. 58-1 at 19.  Similarly, after incorrectly claiming that Change's price for CLIN X013 was the highest among all four offerors, Availity argues—without any further explanation—that Change's unbalanced pricing "likely posed a significant risk to the government."  *Id.* at 21. Availity provides no support for these conclusory statements and thus fails to carry its "minimal burden" to explain what risks Change's unbalanced pricing posed.  *See Ekagra*, 163 Fed. Cl. at 214.

In any event, the CO concluded that Change's proposal for the combined CLINs was understated because the combined cost of the two CLINs was [. . .] percent less than the IGCE, and thus unbalanced.  AR 1084.  Consistent with the FAR, the CO then properly assessed the risk posed by the unbalanced pricing in Change's proposal.  *Id.*  The CO ultimately concluded that the unbalanced pricing posed an "exceedingly low" risk that the Government would pay "unreasonably high prices," and posed "little to no risk to performance of this contract."  AR 1084– 85.  Availity has provided the Court no reason to conclude that such conclusion was irrational.

In sum, the unbalanced pricing analysis was consistent with both the Solicitation and the FAR.  The Court finds no error in the VA's determination that Availity's pricing proposal created a significant risk, or its determination that Change's proposal did not.

3.    The VA Rationally Assigned Two Weaknesses to Availity for its Technical Proposal.

Availity argues that the VA erred in its technical evaluation of Availity's proposal.  ECF No. 58-1 at 24–27.  In its overall analysis, the VA concluded that Availity's "[technical] proposal did not include any strengths, has two weaknesses, and represents a moderate risk to the successful execution of the contract."  AR 1068.  Availity contests two weaknesses that were assessed by the VA: one weakness based on Availity's failure to explain how it would adhere to the hosting requirement, and another weakness based on Availity's failure to explain how it would adhere to the Payer Identifier requirement.  AR 1066, 1067.

The Solicitation clearly instructed offerors to detail how they would execute these technical requirements.  Specifically, it instructed that proposals "shall provide a clear description of the Offeror's proposed technical and business approach for scanning, optical character recognition, and conversion services required to convert paper documents to EDI transactions in the implementation timeframe, and at the operational volume, reporting, and quality level required by the VA as described in the PWS Section 5."  AR 266–67.  In addition, the Solicitation instructed that proposals "shall provide a clear description of the Offeror's proposed technical and business approach for executing EDI transaction processing services while complying with industry-standard data formats in the implementation timeframe, and at the operational volume, reporting, and quality level required by [the] VA as described in the PWS Section 5.2."  AR 267.  More generally, the Solicitation also advised that "[p]roposals that merely restate the requirement or state that the requirement shall be met, without providing supporting rationale, are not sufficient."

AR 263.   Based on the descriptions in the proposal, the VA would evaluate, among other things, whether the offeror's technical approach "adequately considered, defined, and satisfied" the PWS Section 5 requirements.  AR 272.

Availity argues that the VA irrationally concluded that Availity had failed to explain how it would meet the hosting requirements.  ECF No. 58-1 at 25.  The CO explained that "[t]he hosting requirement is where the VA provides the data for certain transactions to allow the clearinghouse (vendor) to respond directly to a provider."  AR 1067.  The VA assessed a weakness because Availity "did not explain [] an approach to receive and store the preplanned responses and how they would use those to respond to the providers."  *Id.*  Availity's proposal stated that, "[a]s a part of [its] hosting services, Availity can create HIPAA X12 and CORE compliant transaction responses from submitter requests and respond to these requests on the VA's behalf."  AR 505.  In support of this statement, Availity indicated that it would "adhere to the existing VA standard implementation guides and data hosting specifications to support the PWS hosting requirements." *Id.*  In addition, Availity pointed out that it "has implemented many health plans on [its] hosted transaction services and support[s] various health plan specific data fields and formats."  *Id.* Notably, however, Availity did not actually explain how it would create compliant hosted transactions—only that it planned to create them.  *See id.*  The Court finds nothing irrational in the VA's conclusion that Availity failed to adequately explain how it would meet the hosting requirements for PWS Section 5.3.2, nor the VA's resultant assessment of a weakness for that reason.

Similarly, the VA rationally assessed a weakness based on Availity's failure to explain how it would meet the requirements of PWS Section 5.2.10.  *See* AR 370–71.  Section 5.2.10, the "Payer Identifiers" requirement, provided that "[t]he contractor shall create and manage payer

identifiers used in payer EDI transactions." AR 370. The CO explained that "Availity did not address their approach as to how they would create payer IDs for the multiple various programs as identified in the PWS" and "only stated that 'Payer Identifiers are planned for later development and implementation.'" AR 1066 (quoting AR 502). By way of analogy, the CO explained that, with respect to transactions, Availity "stated how to write 'the letter' (the claim), but now how to 'address' the letter (Payer ID), whereas both of these are necessary and critical to the process." *Id.*

Availity argues that its capacity to meet the Payer Identifier requirement was evident based on its technical approach as a whole. ECF No. 58-1 at 26. In addition, Availity argues that, because of its existing functions as a clearinghouse, the record necessarily demonstrated that Availity had the capacity to create Payer Identifiers. *Id.* Regardless of whether such an inference could have been made, the Solicitation required offerors to "provide a clear description" of their approach to meeting the requirements of PWS Section 5.2. AR 267. Availity all but concedes that it did not provide such a description, resorting to arguing that page limitations prevented Availity from providing sufficient detail. ECF No. 58-1 at 26.

The VA's assessment of both these weaknesses was reasonable and amply supported by the evidence in the record. The Court therefore concludes that the VA rationally explained its technical assessment of Availity's proposal.

**D.    No Injunctive Relief is Warranted Because Plaintiffs Fail on the Merits.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Achieving success on the merits "is a necessary element for a

permanent injunction." *Dell Fed. Sys. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018).  As neither SSI nor Availity have succeeded on the merits of their protests, no injunctive relief is warranted in this case.

## IV.  CONCLUSION

For the reasons set forth above, the Court **DENIES** SSI's and Availity's Motions to Supplement the Administrative Record (ECF Nos. 36, 41), **DENIES** SSI's and Availity's Second Motions for Judgment on the Administrative Record (ECF Nos. 58, 59), and **GRANTS** the Government's and Change's Cross-Motions for Judgment on the Administrative Record (ECF Nos. 60, 61).  The Court **DENIES AS MOOT** SSI's and Availity's First Motions for Judgment on the Administrative Record (ECF Nos. 42, 43).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after April 10, 2024, unless the parties submit **by no later than April 5, 2024**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: March 29, 2024                              */s/ Kathryn C. Davis*
                                                   KATHRYN C. DAVIS
                                                   Judge